O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DZYNE TECHNOLOGIES, LLC,

                Plaintiff,

     v.

SPACEFLIGHT, INC.,

                Defendant.

Case No.: 2:23-cv-10188-MEMF-ADS

**ORDER DENYING DZYNE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART SPACEFLIGHT'S MOTION FOR SUMMARY JUDGMENT [DKT NO. 61]**

Before the Court is the Joint Motion for Summary Judgment filed by the parties. Dkt. No. 61. For the reasons stated herein, the Court hereby DENIES Plaintiff's Motion and GRANTS in PART Defendant's Motion.

1    **I.    Background**

2         **A.  Factual Background**

3         Plaintiff DZYNE Technologies, LLC entered into a contract with the Air Force Research

4    Laboratory to procure launch vehicles for a military weather satellite project known as WeatherSAT.

5    To meet its obligations under the Prime Contract, DZYNE executed a Launch Services Agreement

6    with Spaceflight, Inc. to provide launch service capabilities for WeatherSAT. After AFRL canceled

7    WeatherSAT, DZYNE sought to terminate the Amended LSA. Spaceflight contests the validity of

8    DZYNE's attempted termination under the Amended LSA.

9         **B.  Procedural History**

10        On December 4, 2023, DZYNE filed its Complaint alleging claims for: (1) breach of

11   contract; (2) unjust enrichment; and (3) declaratory judgment. Dkt. No. 1 ("Compl."). On January

12   26, 2024, Spaceflight filed its Answer and Counterclaim. Dkt. No. 22. In its Counterclaim,

13   Spaceflight alleges counterclaims for: (1) anticipatory breach; (2) breach of implied covenant of

14   good faith and fair dealing; (3) breach of contract; and (4) declaratory judgment. *Id.* at 31-34. On

15   February 16, 2024, DZYNE filed its Answer to Spaceflight's Counterclaim. Dkt. No. 28.

16        On April 18, 2025, the parties filed the instant Joint Motion for Summary Judgment. Dkt. No.

17   61 ("MSJ"). For each party's MSJ, the nonmoving party included its opposition, and the moving

18   party included its reply. *See id.* The parties also filed a Supplement Joint Statement of

19   Uncontroverted Facts and Genuine Disputes and a Joint Appendix of Evidence. Dkt. No. 61-2

20   ("SUF"); 61-3 ("Appendix").

21   **II.   Applicable Law**

22        Summary judgment should be granted if "the movant shows that there is no genuine dispute

23   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

24   56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

25   *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

26   477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

27   return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

28

1    A court must view the facts and draw inferences in the manner most favorable to the non-
2    moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil*
3    *Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of
4    persuasion at trial—usually, but not always, a defendant—has both the initial burden of production
5    and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine*
6    *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the
7    moving party must either: (1) produce evidence negating an essential element of the nonmoving
8    party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving
9    party's case. *Id.*

10    Where a moving party fails to carry its initial burden of production, the nonmoving party has
11    no obligation to produce anything, even if the nonmoving party would have the ultimate burden of
12    persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for
13    summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its
14    burden of production, the burden shifts to the nonmoving party to produce evidence showing a
15    genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,
16    the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the
17    depositions, answers to interrogatories, and admissions on file, designate specific facts showing that
18    there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal
19    quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a
20    genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule
21    56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,
22    against a party who fails to make a showing sufficient to establish the existence of an element
23    essential to that party's case, and on which that party will bear the burden of proof at trial.").

24    A party cannot create a genuine issue of material fact simply by making assertions in its legal
25    papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238
26    (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the
27    dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address
28    another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P.

56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

Where parties file cross motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "[E]ach motion must be considered on its own merits." *Id.* Even if both parties assert that no genuine disputes of material fact exist, the court must still review the record and determine that there are no disputes of material fact before granting summary judgment to either party. *See id.*

### III.    Findings of Fact[1]

#### A.  The Prime Contract

On March 25, 2019, Air Force Research Laboratory ("AFRL") entered into a government contract ("Prime Contract") with DZYNE to procure a space launch vehicle for an experimental military weather satellite project, WeatherSAT. SUF ¶ 1. The Prime Contract incorporated Federal Acquisition Rules ("FAR")[2], including FAR 52.249-2 which states: "The Government may terminate performance of work under this contract in whole or, from time to time, in part, if [t]he Contracting Officer determines that a termination is in the Government's interest." SUF ¶ 3. As part of the Prime Contract, DZYNE was to engage a launch service provider. SUF ¶ 2.

---

[1] The facts set forth below are taken from the SUF and the evidence on the record. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute. Pursuant to Rule 56(g), the Court finds that these facts are "established in the case." See Fed. R. Civ. P. 56(g).

[2] Federal Acquisition Rules are a primary set of rules that governs United States Government purchases and services contracts.

**B.  The LSA**

DZYNE subsequently entered into the Launch Services Agreement ("LSA") with

Spaceflight.[3] SUF ¶ 4. Under the LSA, Spaceflight would provide launch services while DZYNE

produces the launch vehicle. Dkt. No. 61-7 at 1. The price payable to Spaceflight under the

Amended LSA was $10,015,000.00. SUF ¶ 42. During the project, DZYNE advanced $7,839,989.00

to Spaceflight. SUF ¶ 29.

The LSA preamble refers to DZYNE as "Customer" and to Spaceflight as "Spaceflight."

SUF ¶ 5. The LSA incorporates a series of exhibits, including Exhibit G, entitled "FAR and DFARS

Flow Down Clauses." SUF ¶ 6; Dkt. Nos. 61-7 at 34, 61-26 at 5-6. The preamble to Exhibit G states:

"The clauses in Section 52 of the [FAR] and Part 252 of the Defense Federal Acquisition Regulation

Supplement ('DFARS') set forth below are each incorporated herein by reference or in full text and

made a part of the [LSA]. Unless the context of the clause requires otherwise, the term 'Contractor'

shall mean Subcontractor, the term 'Contract' shall mean the [LSA], and the terms 'Government,'

'Contracting Officer,' and equivalent phrases shall mean DZYNE and the DZYNE Subcontracts

Manager, respectively." SUF ¶ 9. Exhibit G specifically incorporates the clause at FAR 52.249-2,

"Termination for Convenience of the Government (FixedPrice)." SUF ¶ 11.

Section 12(E) of the LSA states: "Customer may terminate this Agreement for the

Government's convenience in accordance with FAR 52.249-2."  SUF ¶ 12. Section 12(F) of the

Amended LSA contains identical language. Section 5 of the Amended LSA provides DZYNE with

the right to "request a delay of the Launch at any time up until the Launch Date." Dkt. No. 61-26 at

3. Section 9(I) of the Amended LSA states that if DZYNE "fails to deliver its Spacecraft for

Launch" by the launch window "without exercising its right to delay under Section 5," DZYNE will

be liable for "any remaining payments of the full Price and Spaceflight may opt in its sole discretion

to delay the Launch or terminate" the Amended LSA. Dkt. No. 61-26 at 5. Section 13 of the

---

[3] The parties' motions reference sections from the LSA and Amended LSA. References to "LSA" are to the initial
contract entered into between DZYNE and Spaceflight regarding the WeatherSAT project. Dkt. No. 61-7. References to
section 12(F) are to the executed Amended LSA. Dkt. No. 61-26. The parties do not contest the validity of either
agreement.

Amended LSA indicates that Spaceflight is "entitled to retain and/or be paid all payments made and owed to date" if DZYNE "materially defaults in the performance of any of its duties or obligations under" the Amended LSA. Dkt. No. 61-26 at 6.

On April 27, 2023 and May 4, 2023, DZYNE discussed termination of the LSA with AFRL. *See* SUF ¶ 54-55; Dkt. Nos. 61-32 (including an email discussing DZYNE's "legal counsel's recommendation that AFRL terminate [the Prime Contract] for convenience"), 61-46 (including an email from DZYNE to AFRL recommending AFLR "use the language Termination by Convenience").

### C. Issues with WeatherSAT

DZYNE and Spaceflight faced delays on the project, including the cessation of operations by the launch provider. *See* SUF ¶ 46, 48-50. Under section 12(C) of the Amended LSA, Spaceflight had the right to remanifest the satellite spacecraft with an alternate launch provider before DZYNE had the right to terminate. SUF ¶ 51. Section 5 of the Amended LSA also provided DZYNE with a right to delay the launch. DZYNE never sought to delay the launch pursuant to section 5. SUF ¶¶ 49, 52.

On May 23, 2023, DZYNE and Spaceflight executed a transfer agreement wherein Spaceflight notified DZYNE that Firefly Aerospace, Inc. intended to acquire all of Spaceflight's outstanding equity and DZYNE consented to "any Transfer as to which consent or waiver may be required under the [LSA]" as a result of the transaction. SUF ¶ 14. The Transfer Agreement states that, "in the event that [DZYNE] terminate[s] the [LSA] for any reason other than as a result of the Transfer, and such termination occurs within forty-five days of the date of this letter agreement, [Spaceflight] (a) shall provide a termination settlement proposal to [DZYNE] with respect to such termination of the [LSA] no later than thirty days after notice of termination by [DZYNE], notwithstanding any longer time provided for by the [LSA] or any regulations incorporated therein." SUF ¶ 15. The Transfer Agreement did not modify the permitted grounds for termination under the Amended LSA. SUF ¶ 53.

### D. AFRL Directives

On May 31, 2023, AFRL emailed DZYNE a draft memo "directing WeatherSAT activities" "be discontinued." SUF ¶ 58. On June 5, 2023, AFRL issued a Government Directive to DZYNE stating that AFRL "determined it no longer wishes to pursue further research and development under [the WeatherSAT] project" and directing DZYNE "to cease any and all effort related to the WeatherSAT Project Launch, to include any effort being performed by Subcontractors and/or vendors." SUF ¶ 16. On June 7, 2023, DZYNE notified Spaceflight of AFRL's directive, notified Spaceflight that DZYNE was terminating the LSA for convenience, and requested Spaceflight provide a detailed accounting of expenses incurred and expected. *See* SUF ¶¶ 17, 59-60. In response, Spaceflight requested a meeting with DZYNE to discuss the AFRL's Directive. SUF ¶ 20. Following the parties' meeting, DZYNE issued an updated LSA termination notice to Spaceflight on June 12, 2023. SUF ¶ 21.

Spaceflight then asserted that DZYNE "only has the right to invoke FAR 52.249-2" if AFRL terminates the Prime Contract for its convenience. SUF ¶ 22. On June 30, 2023, DZYNE sent Spaceflight a letter reiterating the AFRL's Directive to Spaceflight and requested Spaceflight "immediately to stop work for all efforts under [the LSA]." SUF ¶ 23. Spaceflight did not produce a termination settlement proposal before or on July 8, 2023. SUF ¶ 24.

On July 13, 2023, Spaceflight notified DZYNE that the remanifest provisions of the Amended LSA controlled the circumstances and that Spaceflight was prepared to work with DZYNE to provide remanifest opportunities with alternative launch vehicle providers. SUF ¶ 66. DZYNE refused a remanifest opportunity, stating: "There is no remanifest opportunity. The Air Force does not have a satellite to launch, nor do they plan to provide one." *Id.*

On October 16, 2023, AFRL issued a second Directive to DZYNE, directing DZYNE to "cease any and all effort related to the WeatherSAT Project Launch," and stated that no "WeatherSAT Project Launch or any other spacecraft launch activities will continue under the subject contract." SUF ¶ 25. The October AFRL Directive further directed DZYNE to provide AFRL with "[c]onfirmation that all work has stopped related to the WeatherSAT Project Launch," including "all subcontracted efforts." SUF ¶ 26. On October 20, 2023, DZYNE forwarded the

October AFRL Directive to Spaceflight. SUF ¶ 27. A launch vehicle was never delivered by DZYNE. *See* SUF ¶ 66 (indicating DZYNE did not intend to provide a launch vehicle following AFRL's directives).

### E. Damages

During the project, DZYNE sent $7,839,989 to Spaceflight. SUF ¶ 29. Spaceflight paid $800,000 to Virgin Orbit. SUF ¶ 30. Spaceflight also delivered a motorized lightband system to DZYNE valued at $165,000. SUF ¶ 31. On November 10, 2023, Spaceflight invoiced DZYNE for the remaining outstanding balance of the Amended LSA in the amount of $2,175,102. SUF ¶ 69. On March 25, 2025, six days after DZYNE transmitted its motion for summary judgment, Spaceflight transmitted to DZYNE an accounting of direct and indirect costs incurred related to the Amended LSA totaling $2,335,682.36. SUF ¶ 32.

## DZYNE'S MOTION FOR SUMMARY JUDGMENT

### I.    Discussion

DZYNE moves for summary judgment in its favor on the following claims: (1) breach of contract; (2) unjust enrichment; and (3) declaratory judgment. Dkt. No. 61-1 at 11. DZYNE's motion is based upon its contentions that (1) the AFRL terminated the Prime Contract for AFRL's convenience; (2) the Amended LSA provides DZYNE with the unconditional right to terminate the LSA for DZYNE's convenience; and (3) DZYNE is entitled to a damages award of $6,874,898 for the balance of the amount paid to Spaceflight. For the reasons discussed below, the Court finds that AFRL did not "terminate for convenience" and DZYNE did not have the right to terminate for convenience.

### A.    DZYNE is Not Entitled to Summary Judgment In Its Favor On Its Declaratory Judgment Claim as It Was Not Entitled to Terminate Based Upon the AFRL Directives Or Its Own Convenience

In its third cause of action DZYNE seeks declaratory judgment regarding the meaning of the LSA. In particular, DZYNE seeks the following: "this Court declare the express terms of the LSA provided DZYNE the unilateral right to terminate the LSA for its convenience; or, in the alternative, the express terms of the LSA provided DZYNE the right to terminate the LSA based upon the

1  express direction received from AFRL following cancellation of the [WeatherSAT]." Dkt. No. 1 at

2  15.

3       To obtain declaratory relief, there must be a "substantial controversy between parties having

4  adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory

5  judgement." *S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028,

6  1035 (9th Cir. 2009); *Bayer v. Neiman Marcus Gr., Inc.*, 861 F.3d 853, 867 (9th Cir. 2017). Here,

7  DZYNE and Spaceflight seek declaratory relief with respect to the LSA. Dkt. Nos. 61-1 at 11, 61-22

8  at 35.The parties dispute a contractual right: DZYNE's right to terminate the LSA, which has

9  significant implications as to the causes of actions alleged and damages sought. Given this, the Court

10  finds the instant matter appropriate for declaratory relief.

11       Having determined that a real controversy exists, the Court proceeds to examine the

12  undisputed facts and the legal questions presented by this claim.

13

14        i.  **Even Reading All the Undisputed Facts in DZYNE's Favor, AFRL Did
Not Terminate the Prime Contract For Convenience Under the FAR**

15  DZYNE argues that it is entitled to summary judgment because the AFRL explicitly or

16  constructively terminated the Prime Contract for the ARFL's convenience pursuant to FAR 52.249-

17  2. MSJ at 27. Thus, DZYNE has the burden of establishing there is no genuine dispute of fact that

18  the AFRL terminated the Prime Contract for AFRL's convenience. *Nissan Fire*, 210 F.3d at 1102.

19       The Court applies standard rules of contract interpretation to determine whether the AFRL

20  terminated the Prime Contract for the AFRL's convenience. "A written contract must be read as a

21  whole and every part interpreted with reference to the whole, with reasonable preference given to

22  reasonable interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th

23  Cir. 1999, *opinion amended on denial of reh'g*, 203 F.3d 1175, 1210 (9th Cir. 2000); *Kennewick Irr.*

24  *Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). "Whenever possible, the plain language

25  of the contract should be considered first." *Id.* "Contract terms are to be given their ordinary

26  meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained

27  from the contract itself." *Id.* "A contract is ambiguous if reasonable people could find its terms

28

1    susceptible to more than one interpretation." *Kennewick*, 880 F.2d at 1032; *Castaneda v. Dura-Vent*

2    *Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).

3         It is undisputed that FAR 52.249-2(a) permits AFRL to terminate performance of work under

4    the Prime Contract "if the Contracting Officer determines that a termination is in the Government's

5    interest." SUF ¶ 12. This is referred to as a "termination for convenience," and there is a

6    considerable body of law that has grown up around this right of the government to terminate a

7    contract for its convenience. *See VHC, Inc. v. Peters*, 179 F.3d, 1363, 1364-65 (Fed. Cir. 1999)

8    (involving clear termination by the government); *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1333

9    (9th Cir. 2003) (same). Not only does FAR 52.249-2(a) permit termination for convenience, it

10   specifies how the Government may exercise this right. In fact, FAR 52.249-2(a) requires that to

11   terminate for convenience, the Government must issue a Notice of Termination that contains certain

12   proscribed information: "The Contracting Officer *shall terminate by delivering to the Contractor a*

13   *Notice of Termination* specifying the extent of termination and the effective date." 48 C.F.R. §

14   52.249-2(a). Another section of the FAR sets forth additional requirements on the Notice of

15   Termination when the Government seeks to exercise its right to terminate for convenience: FAR

16   49.102.  According to FAR 49.102,

17
         [T]he contracting officer shall terminate contracts for convenience . . . *only* by a written
18       notice to the contractor (see 49.601). . . . The notice shall state — . . .
         (1) That the contract is being terminated for the convenience of the Government . . . under
19       the contract clause authorizing the termination.

20       48 C.F.R. § 49.102

21       It is also undisputed that the LSA provided DZYNE with certain "Customer Termination

22   Rights." Dkt. No. 61-26 at 5-6. Among them was the following: "Customer may terminate this

23   Agreement for the Government's convenience in accordance with FAR 52.249-2." *Id.*

24       Finally, it is undisputed that AFRL never transmitted to DZYNE any document described as

25   a "Notice of Termination," and that at no point did it provide notice "that the contract is being

26   terminated for the convenience of the Government . . . under the contract clause authorizing the

27   termination" pursuant to FAR 49.102. In fact, it is undisputed that DZYNE requested that AFRL

28   provide such a notice, and AFRL did not do so. Dkt. No. 61-46.

1    Accordingly, given these undisputed facts, the question before this Court is whether AFRL's

2    Directives permitted DZYNE to terminate the Prime Contract pursuant to Paragraph 12(F). The

3    Court finds that they do not.

4    As a preliminary matter, the plain language of the Prime Contract is that any right DZYNE

5    had to terminate the contract for the Government's convenience had to be "in accordance with FAR

6    52.249-2."

7    Given that, this Court must determine whether the Government ever terminated the work

8    under the Prime Contract "in accordance with FAR 52.249-2." It did not. Terminating for

9    convenience in accordance with FAR 52.249-2 required that the Government transmit a notice to

10    DZYNE explicitly stating that the Government was "terminating for convenience." AFRL never

11    transmitted any such notice, even when asked. Dkt. No. 61-46. And this cannot be treated as a mere

12    oversight or a technical requirement that this Court can overlook. As stated above, there is a large

13    body of law regarding terminations for convenience, and the FAR is explicit about the requirements,

14    given the breadth of the right and the important implications that flow from a termination being

15    considered a termination for convenience as opposed to some other termination. *VHC, Inc.*, 179 F.3d

16    at 1364-65 (involving clear termination by the government); *Rumsfeld*, 325 F.3d at 1333 (same);

17    *Coll. Point Boat Corp v. United States*, 267 U.S. 12, 15 (1925) (determining there was no finding of

18    fact the contract was cancelled because the Navy failed to give the notice requisite to terminate the

19    contract).

20    AFRL never terminated the contract for convenience under the FAR and therefore DZYNE

21    never had the power to terminate the LSA under 12(F).

22    DZYNE argues in the alternative that AFRL "constructively terminated" the contract, which

23    then permitted DZYNE to invoke 12(F). MSJ at 29-30 (citing *Praecomm, Inc. v. United States*, 78

24    Fed. Cl. 5, 11 (2007)). DZYNE cites to the AFRL's Contracting Officer's June 5, 2023 AFRL

25    directive (Dkt. No. 61-11) and the October 16, 2023 AFRL directive (Dkt. No. 61-16) discussing the

26    cancellation of WeatherSAT. DZYNE claims that the directives constitute a termination for the

27    AFRL's convenience under FAR 52.249-2. The June 5, 2023 AFRL directive to DZYNE stated that

28    AFRL "no longer wishes to pursue further research and development" under WeatherSAT and

1   instructed DZYNE to "cease any and all effort related to the WeatherSAT Project Launch, to include

2   any effort being performed by Subcontractors and/or vendors." Dkt. No. 61-11; SUF ¶ 16.  The

3   October 16, 2023 AFRL directive to DZYNE referred DZYNE to the June directive reiterating that

4   no WeatherSAT related activity will continue, and requested confirmation that WeatherSAT related

5   work, including subcontracted efforts, had ceased. Dkt. No. 61-16; SUF ¶ 25. DZYNE asserts that

6   because the AFRL directives instruct DZYNE to "cease all activity" on WeatherSAT and provide

7   AFRL with "confirmation that all work has stopped," the directives constitute AFRL's unequivocal

8   termination for AFRL's convenience. MSJ at 28.

9        But, as Spaceflight points out, and as the case law makes clear, constructive termination is a

10  judge made doctrine which has developed to save the Government from the alternative – a finding of

11  breach. *Maxima Corp. v. United States*, 847 F.2d 1549, 1552-54 (9th Cir. 1988). There is no

12  authority for reading the phrase "in accordance with FAR 52.249-2" to mean "in accordance with

13  FAR 52.249-2 or under the judge-made doctrine of constructive termination for convenience." Even

14  those cases which address constructive termination make clear that it is a means of retroactively

15  justifying what would otherwise be a government breach.[4] This Court declines to read the contract to

16  also incorporate this principle because to do so would introduce uncertainty into the contract. There

17  is nothing which suggests that the parties intended to introduce this level of uncertainty into the

18  contract, and as a practical matter, enforcement of this reading of the contract would be extremely

19  difficult, if not impossible. Contracts are intended to provide clear expectations to the parties, and

20  this one did. DZYNE's reading would do the opposite and there is no reason to find that this was the

21  parties' intent.

22       Viewing the evidence in the light most favorable to Spaceflight, the Court finds DZYNE has

23  failed to establish that AFRL terminated performance for convenience "in accordance with FAR

24  52.249-2" and therefore has failed to establish that it was permitted to terminate the LSA under

25

26

27  _____

28  [4] The Court also notes that in *Praecomm*, the Government directly invoked the termination for convenience clause. *Id.* Here, as argued by Spaceflight, the AFRL directives did not invoke the termination for convenience clause at all and the record indicates a refusal to do so after recommendations from DZYNE. Dkt. Nos. 61-11, 61-16, 61-46.

paragraph 12(F). DZYNE is therefore not entitled to summary judgment on this ground on its declaratory judgment claim.

### ii. The Amended LSA Does Not Provide DZYNE an Unconditional Right to Terminate the Amended LSA for DZYNE's Convenience

DZYNE next argues that, even if the Court finds that the AFRL did not terminate the Prime Contract for AFRL's convenience, it is undisputed that the Amended LSA provides DZYNE an unconditional right to terminate the Amended LSA for DZYNE's convenience.

DZYNE bases its argument on section 12(F) of the Amended LSA and Exhibit G of the LSA, in which numerous FAR provisions including FAR 52.249-2 are incorporated by reference. MSJ at 16; Dkt. Nos. 61-7 at 34, 61-26. DZYNE emphasizes that the FAR provisions are "flow-down clauses," meaning that the rights and responsibilities transfer from the contractor (AFRL) to the subcontractor (DZYNE). MSJ at 16. Exhibit G contains a substitution clause whereby the terms 'Government,' 'Contracting Officer,' and equivalent phrases shall mean DZYNE and DZYNE's Subcontracts manager. *Id.*; SUF ¶ 9. DZYNE posits that because of the substitution clause, the Amended LSA shall be read to include the following provision: "*DZYNE may terminate performance of work under this contract in whole or, from time to time, in part if DZYNE determines that a termination is in DZYNE's best interest.*" MSJ at 17 (emphasis added). Thus, DZYNE submits that there is no genuine dispute of fact that the Amended LSA provides DZYNE a right to terminate the Amended LSA for DZYNE's convenience.

Spaceflight, however, contends that DZYNE's reading, and application of the flow-down clause would contradict the purpose of FAR 52.249-2 as it would "take a clause intended to accommodate the Government and convert it into a clause to accommodate" DZYNE. MSJ at 21. Spaceflight also points to DZYNE's request to the AFRL Contracting Officer to include "Termination for Convenience" language in an updated directive as an implicit admission by DZYNE that the substitution clause alone does *not* provide DZYNE with an unconditional right to terminate for its convenience. *Id.*; Dkt. No. 61-48. Spaceflight, thus, contends that there is nothing in the Amended LSA expressly authorizing DZYNE to terminate the Amended LSA for DZYNE's convenience and the parties did not intend DZYNE to possess a right to terminate the Amended LSA

1 for DZYNE's convenience.[5] Given this, Spaceflight argues that a reasonable interpretation of section

2 12(F) is that the right to terminate the Amended LSA is limited to the AFRL. MSJ at 21.

3       Here, the Court finds that given the plain language of section 12(F) and Exhibit G of the

4 Amended LSA, DZYNE does not have an unconditional right to terminate the Amended LSA for

5 DZYNE's convenience.

6       First, the preamble to Exhibit G stating "unless the context of the clause requires otherwise"

7 qualifies the substitution clause. Dkt. No. 61-7 at 34. The Court finds that, through the qualifying

8 language, the contract can be read harmoniously.[6] The flow-down clauses, including the substitution

9 clause discussed by the parties regarding section 12(F) and Exhibit G are not innately in conflict as

10 their application is dependent on the "context of the clause." MSJ at 24-25; Dkt. No. 61-7 at 34. For

11 instance, a reasonable person could find that the context of section 12(F) does not warrant Exhibit G

12 taking effect. A reasonable interpretation of section 12(F) is that the right to terminate the Amended

13 LSA is limited to the AFRL and the context renders Exhibit G's substitution effect inapplicable. This

14 understanding aligns the Court's preference to give effect to the parties' shared intent when they

15 entered into the agreement. Cal. Civ. Code §§ 1636, 1652 ("Repugnancy in a contract must be

16 reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses,

17 subordinate to the general intent and purpose of the whole contract."). Because the express terms of

18 the contract and the parties' conduct do not explicitly set forth the application of the flow-down

19 clauses pertaining to section 12(F) and Exhibit G, there is a genuine dispute of fact as to whether the

20

21 ――――――――――――――

[5] Spaceflight's opposition contains citations to Chierchella declaration, the SUF, and exhibits contained in the MSJ.
22 DZYNE argues that the Chierchella declaration should not be considered because it is "inadmissible expert opinion on
legal conclusions and unfounded speculation" regarding DZYNE's state of mind. MSJ at 23-24; *see United States v.*
23 *Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015) ("An expert cannot testify to a matter of law amounting to a legal
conclusion."). Spaceflight does not directly address this contention. Because the underlying facts regarding the timeline
24 of events as to the Prime Contract and Amended LSA in Chierchella's declaration can be provided in admissible form at
trial, the Court determines that the factual contents contained in Chierchella's declaration are proper for summary
judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not
25 focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Block v. City
of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to
26 produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal
Rule of Civil Procedure 56."); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (finding
27 "declarations that ... contain[ed] hearsay [were] admissible for summary judgment purposes because they could be
presented in an admissible form at trial" (internal quotation marks omitted)).
28 [6] Spaceflight states that section 12(F) and Exhibit G are "most certainly" in conflict and cannot be read harmoniously.
MSJ at 21.

1    Amended LSA permits DZYNE to 'substitute' itself for the AFRL and terminate the Amended LSA

2    for DZYNE's convenience.

3            Second, DZYNE fails to provide binding on point authority as to the effect of flow-down

4    clauses. DZYNE relies on *Aspic Engineering and Construction Co. v. ECC Centcom Constructors*

5    *LLC*, 913 F.3d 1162, 1168-69 (9th Cir. 2019) where FAR 52.249-2 is implicated, to argue that the

6    flow-down clauses "imposed the same termination for convenience procedures onto the parties to the

7    subcontract." MSJ at 18. *Aspic* is distinguishable. There, the Government explicitly terminated the

8    prime contract "for convenience," which allowed the contractor to subsequently terminate the

9    subcontracts. *Aspic*, 913 F.3d at 1164. Unlike *Aspic*, the AFRL directives do not explicitly state that

10   the AFRL terminated the Prime Contract for AFRL's convenience or refer to FAR 52.249-2. *See*

11   Dkt. Nos. 61-11, 61-16. Thus, the Court does not find *Aspic* to be persuasive in this matter.

12           Third, DZYNE's reading of Exhibit G would render 12(F)—and, indeed, all of 12—

13   superfluous. If DZYNE, pursuant to Exhibit G, could terminate the LSA at any time for its

14   convenience, why would the contract contain a clause permitting DZYNE to terminate the LSA for

15   the Government's convenience? In fact, why would the contract contain any clauses outlining

16   DZYNE's "Customer Termination Rights." There is nothing in the record which supports the idea

17   that the parties' intent in Exhibit G was to obliterate paragraph 12 altogether and the Court declines

18   to read it that way.

19           Accordingly, viewing the evidence in the light most favorably as to Spaceflight, the Court

20   finds that DZYNE has failed to establish that it had an unconditional right to terminate the Amended

21   LSA for DZYNE's convenience. It is therefore not entitled to summary judgment in its favor on this

22   ground on its declaratory judgment claim.

23

24           **B.  DZYNE is Not Entitled to Summary Judgment In Its Favor On Its Breach of
                   Contract Claim as Spaceflight Did Not Materially Breach the Transfer
25                 Agreement.**

26           In its first cause of action DZYNE seeks the Court to determine that Spaceflight breached the

27   Amended LSA by failing to provide a termination settlement proposal within 30 days of DZYNE's

28   termination of the Amended LSA for DZYNE's convenience. Dkt. No. 1 at 13. In particular,

1   DZYNE seeks the following: "this Court declare the express terms of the LSA provided DZYNE the

2   unilateral right to terminate the LSA for its convenience; or, in the alternative, the express terms of

3   the LSA provided DZYNE the right to terminate the LSA based upon the express direction received

4   from AFRL following cancellation of the [WeatherSAT]." Dkt. No. 1 at 15.

5          The elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's

6   performance of the contract; (3) defendant's material breach of the contract; and (4) damages to

7   plaintiff resulting from the breach. *Abdelhamid v Fire Ins. Exchange*, 106 Cal. Rptr. 3d 26, 32 (Cal.

8   Ct. App. 2010).

9                    i.       **There is a valid and enforceable contract**

10         It is undisputed that the parties entered in a valid and enforceable contract: the LSA, and

11  subsequently the Amended LSA. SUF ¶ 4. It is further undisputed that the parties executed a transfer

12  agreement on May 23, 2023 wherein Firefly "acquired all of Spaceflight's outstanding equity," and

13  the agreement provided that "in the event that [DZYNE] terminate[s] the [LSA] for any reason other

14  than as a result of the Transfer, and such termination occurs within forty-five days of the date of this

15  letter agreement, [Spaceflight] (a) shall provide a termination settlement proposal to [DZYNE] with

16  respect to such termination of the [LSA] no later than thirty days after notice of termination by

17  [DZYNE], notwithstanding any longer time provided for by the [LSA] or any regulations

18  incorporated therein." SUF ¶¶ 14-15. The parties do not dispute that Spaceflight has not provided a

19  termination settlement proposal to DZYNE. SUF ¶ 24. Therefore, the Court finds the existence of a

20  valid and enforceable contract.

21                   ii.      **Spaceflight did not breach the Amended LSA**

22         DZYNE argues that following AFRL's directive on June 5, 2023, the Prime Contract was

23  terminated for the AFRL's convenience and thus, DZYNE had the right to terminate the Amended

24  LSA. MSJ at 5-6. Acting on this belief, DZYNE, on June 7, 2023, notified Spaceflight that it was

25  terminating the Amended LSA. *See* SUF ¶¶ 17, 59-60. Because DZYNE terminated the Amended

26  LSA within 45 days of the transfer agreement, DZYNE asserts that it met its contractual duties under

27  the transfer agreement and Spaceflight was obligated to "provide a termination settlement proposal"

28  within 30 days. MSJ at 9. As Spaceflight never produced a termination settlement proposal, DZYNE

1  contends that Spaceflight breached the transfer agreement and "DZYNE is entitled to an entry of a

2  damages award of $6,874,898." MSJ at 15.

3      In response, Spaceflight reiterates that because AFRL did not terminate the Prime Contract

4  for AFRL's convenience and DZYNE had no unconditional right to terminate the Amended LSA,

5  Spaceflight was not required to provide a termination settlement proposal to DZYNE. MSJ at 34.

6  According to Spaceflight, a termination settlement proposal is implicated upon the proper

7  termination of the Amended LSA. MSJ at 34-35. As DZYNE had no right to terminate the Amended

8  LSA, Spaceflight claims that it did not breach the Amended LSA by failing to produce a termination

9  settlement proposal. *Id.*

10     It is undisputed that DZYNE terminated the Amended LSA on June 7, 2023, following the

11  AFRL's June 5, 2023 directive. *See* SUF ¶¶ 17, 59-60. Thus, if the Court found that DZYNE was

12  entitled to terminate the Amended LSA, and because Spaceflight never submitted a termination

13  settlement proposal (SUF ¶ 24), then Spaceflight would have breached the Amended LSA.

14  *Abdelhamid*, 106 Cal. Rptr. 3d at 32. However, as discussed, the AFRL never provided DZYNE

15  with any document stating that the Prime Contract was terminated for AFRL's convenience per FAR

16  52.249-2. In fact, the AFRL never sent DZYNE a "Notice of Termination" under FAR 49.102, even

17  after DZYNE requested one. Dkt. No. 61-46. Additionally, the plain language of the Amended LSA

18  does not entitle DZYNE to terminate the Amended LSA for DZYNE's convenience. The parties'

19  conduct does not support an intent to provide DZYNE with an unconditional right to terminate the

20  Amended LSA, and DZYNE has not provided any authority substantiating such a right through

21  Exhibit G and section 12(F). As the Court does not find that DZYNE was entitled to terminate the

22  Amended LSA, Spaceflight's termination settlement proposal obligation under the transfer

23  agreement was not triggered. Therefore, Spaceflight did not materially breach the Amended LSA by

24  failing to provide a termination settlement proposal to DZYNE. *Abdelhamid*, 106 Cal. Rptr. 3d at 32.

25          iii.    **The Court does not need to reach the issue of damages**

26     Because the Court finds the DZYNE failed to establish that the AFRL terminated the Prime

27  Contract for its Convenience or DZYNE had an unconditional right to terminate for its convenience,

28  the Court finds there is a genuine dispute of fact as to whether Spaceflight breached the Amended

LSA. As such, the Court need not reach the issue of "damages resulting from [a] breach." *Abdelhamid*, 106 Cal. Rptr. 3d at 32. Further, as the Court concludes there was not termination for convenience, the Court need not reach the issue of what costs are permitted under a termination for convenience.

Accordingly, viewing the evidence in the light most favorably as to Spaceflight, the Court finds that DZYNE has failed to establish that Spaceflight breached the Amended LSA.

### C. DZYNE is Not Entitled to Summary Judgment In Its Favor On Its Unjust Enrichment Claim as Spaceflight Did Not Improperly Retain Funds.

In its second cause of action DZYNE seeks the Court to conclude that Spaceflight has unjustly enriched itself by retaining funds which DZYNE advanced to Spaceflight that "were not spent on activities related to" the Amended LSA prior to DZYNE's termination. Dkt. No. 1 at 14.

Under California law, "[t]he elements of a cause of action for unjust enrichment are simply stated as receipt of a benefit and unjust retention of the benefit at the expense of another." *Tufeld Corp. v. Beverly Hills Gateway, L.P.*, 302 Cal. Rptr. 3d 203, 216 (Cal. Ct. App. 2022). However, California courts have held that there is no standalone unjust enrichment claim in California. *See Melchior v. New Line Prods, Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003) ("[T]here is no cause of action in California for unjust enrichment."). "As a matter of law, an unjust enrichment claim does not lie where parties have an enforceable express contract." *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Cal. Ct. App. 2010)).

It is undisputed that DZYNE transferred $7,839,898 to Spaceflight under the LSA for WeatherSAT related work. SUF ¶¶ 6, 29. The parties further agree that Spaceflight incurred costs of at least $965,000. SUF ¶ 30-31. DZYNE claims there is no evidence of any other cost incurred by Spaceflight and thus, DZYNE is owed $6,874,898 in damages.[7] MSJ at 34. Because Spaceflight continues to retain $6,874,898, DZYNE contends that Spaceflight has been unjustly enriched. *Id.*

---

[7] DZYNE calculates its damages by taking the initial transfer amount ($7,839,898), then subtracting Spaceflight's undisputed incurred costs related to WeatherSAT ($965,000), to arrive at $6,874,898.

Spaceflight, however, contends: (1) DZYNE is not entitled to damages because AFRL never submitted a notice of termination for its convenience as required by FAR 52.249-2(e); and (2) even if damages can be proven (i.e. AFRL terminated the Prime Contract for its convenience), Spaceflight produced evidence amounting to $2,335,682.36 in incurred costs (Dkt. No. 61-30). MSJ at 34-35. DZYNE counters that Spaceflight's accounting constituted a late disclosure as they were not previewed to the accounting prior to their MSJ. MSJ at 37. As DZYNE improperly terminated the Amended LSA, never delivered the AFRL satellite, and rebuffed Spaceflight's offer to remanifest under section 12(C) of the Amended LSA, Spaceflight argues that DZYNE breached the Amended LSA, and it has not unjustly retained $6,874,898. MSJ at 38.

Given that the Court has found that DZYNE failed to establish entitlement to terminate the Amended LSA, the Court determines that Spaceflight has not breached the Amended LSA and not unjustly retained benefits at the expense of DZYNE. *Tufeld Corp.*, 302 Cal. Rptr. 3d at 216. In addition, because the Court finds there is a valid and enforceable contract, an unjust enrichment claim cannot stand. *Durell*, 108 Cal. Rptr. 3d at 699.

Accordingly, viewing the evidence most favorable to Spaceflight, DZYNE is not entitled to summary judgment as to DZYNE's unjust enrichment claim.

## SPACEFLIGHT'S MOTION FOR SUMMARY JUDGMENT

**I.    Discussion**

Spaceflight seeks summary judgment, or in the alternative, partial summary judgment, in its favor on the following counterclaims: (1) anticipatory breach; (2) breach of implied covenant of good faith and fair dealing; (3) breach of contract; and (4) declaratory judgment. Dkt. No. 28 at 31-34. For the reasons set forth below, the Court GRANTS in PART Spaceflight's motion for summary judgment.

**A.    Spaceflight is Entitled to Summary Judgment In Its Favor On Its Declaratory Judgment Claim as DZYNE Was Not Entitled to Terminate Based Upon the AFRL's Directives Or Its Own Convenience.**

In its fourth cause of action Spaceflight seeks declaratory judgment regarding the meaning of the LSA. In particular, Spaceflight seeks the following: "this Court declare the Amended LSA does

1  not provide DZYNE the unilateral right to terminate the Amended LSA for DZYNE's convenience;

2  and, declare that the Amended LSA does not provide DZYNE the right to terminate the Amended

3  LSA under Section 12(F) for anything less than the Government's actual termination of DZYNE's

4  prime contract (in whole or in part)." Dkt. No. 28 at 34.

5      To obtain declaratory relief, there must be a "substantial controversy between parties having

6  adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory

7  judgement." *Rodin*, 558 F.3d at 1035; *Bayer*, 861 F.3d at 867.

8      To reiterate, Spaceflight disputes DZYNE's termination of the Amended LSA, arguing that:

9  (1) AFRL did not terminate the Prime Contract for AFRL's convenience pursuant to FAR 52.249-2,

10  and (2) the Amended LSA does not provide DZYNE with an unconditional right to terminate the

11  Amended LSA for DZYNE's convenience. MSJ at 19-21, 30. Spaceflight explains that the AFRL's

12  directives should not be regarded as a "termination for convenience" as they "do[] not comply with

13  FAR Termination for Convenience requirements" under FAR 49.102. MSJ at 31. Spaceflight further

14  details that the "evidence proves that despite multiple urgings by DZYNE, AFRL adamantly avoided

15  terminating the Prime Contract for convenience." MSJ at 30. Additionally, Spaceflight discusses

16  how reading section 12(F) and Exhibit G as authorizing DZYNE to terminate the Amended LSA for

17  its convenience would contravene the plain language of the contract. MSJ at 19-20; *Klamath*, 203

18  F.3d at 1210.

19      As explained, DZYNE did not have right to terminate the Amended LSA for its convenience.

20  Although DZYNE asserts that the AFRL either explicitly or constructively terminated the Prime

21  Contract for the AFRL's convenience through the AFRL's directives, the Court, applying standard

22  rules for contract interpretation, finds no record of the AFRL providing DZYNE with any Notice of

23  Termination or document complying with FAR 49.102 or invoking FAR 52.249-2. In fact, evidence

24  supports the AFRL failing to do so when requested by DZYNE. Dkt. No. 61-46. Also, DZYNE's

25  arguments that it had an unconditional right to terminate the Amended LSA through section 12(F)

26  and Exhibit G are unfounded. DZYNE's reading of section 12(F) and Exhibit G as providing

27  DZYNE the right to substitute itself for the Government is unsupported by precedent, fails to

28  consider the qualifying language contained in the preamble to Exhibit G, and would render the

Amended LSA superfluous. Therefore, the Court concludes that DZYNE did not have the right to terminate the Amended LSA.

Accordingly, viewing the evidence most favorably as to DZYNE, the Court finds that Spaceflight established that DZYNE did not have an unconditional right to terminate the Amended LSA for DZYNE's convenience. It is therefore entitled to summary judgment in its favor on this ground on its declaratory judgment claim.

### B. Spaceflight is Entitled to Summary Judgment In Its Favor On Its Breach of Contract and Anticipatory Breach Claims as DZYNE Wrongfully Terminated the Amended LSA.

In its first and third cause of action Spaceflight seeks the Court to hold that DZYNE anticipatorily breached and breached the Amended LSA. Dkt. No. 28 at 31, 33.

The elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance of the contract; (3) defendant's material breach of the contract; and (4) damages to plaintiff resulting from the breach. *Abdelhamid*, 106 Cal. Rptr. 3d at 32. An "[a]nticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform." *Taylor v. Johnston*, 123 Cal. Rptr. 641, 646 (Cal. 1975).

Spaceflight alleges breach of contract claims against DZYNE. First, Spaceflight claims DZYNE anticipatorily breached the Amended LSA by terminating the Amended LSA on June 7, 2023 without providing Spaceflight the opportunity to remanifest the spacecraft pursuant to section 12(C) of the Amended LSA. MSJ at 38; SUF ¶ 66. And second, Spaceflight asserts DZYNE breached the Amended LSA because it is undisputed that DZYNE did not exercise its right to delay under section 5 of the Amended LSA, did not deliver the satellite spacecraft, and denied Spaceflight's attempts to remanifest under section 12. MSJ at 38-39; Dkt. No. 61-26 at 5; SUF ¶¶ 45 ("[T]he [] LSA provided a launch window of December 15, 2022 to April 30, 2023."), 49 ("DZYNE does not dispute that it did not invoke the delay provision of the [] LSA."), 66.

DZYNE argues that it is entitled to terminate the Amended LSA under section 12(F) and Exhibit G and thus, DZYNE was not required to provide Spaceflight an opportunity to remanifest or

deliver the satellite. MSJ at 16, 27. As such, whether DZYNE breached the Amended LSA is a matter of contract interpretation regarding whether DZYNE had a right to terminate the Amended LSA.

### i. The Amended LSA is valid and enforceable

First, as held, the Amended LSA constitutes a valid and enforceable contract between DZYNE and Spaceflight. *Abdelhamid*, 106 Cal. Rptr. 3d at 32. This is undisputed. SUF ¶ 4.

### ii. Spaceflight was ready to perform its duties under the Amended LSA

Second, Spaceflight states that it "was ready to perform under the Amended LSA, and time for performance had not yet arrived" because the right to delay as well as the right to remanifest were still available when DZYNE terminated the Amended LSA on June 7, 2023. MSJ at 38; SUF ¶¶ 45, 49, 66; *see Abdelhamid*, 106 Cal. Rptr. 3d at 32.

### iii. DZYNE materially breached the Amended LSA

Third, Spaceflight argues that DZYNE materially breached the Amended LSA by failing to exercise its right to delay and then subsequently failing to deliver the satellite spacecraft, and by rebuffing Spaceflight's attempt to remanifest. MSJ at 38-39.

Here, the Court determines that the record demonstrates that the AFRL never terminated the Prime Contract for its convenience and DZYNE is not entitled to terminate the Amended LSA for its convenience. Thus, DZYNE improperly terminated the Amended LSA on June 7, 2023, and the terms set forth in the Amended LSA bind the parties' obligations. Because it is undisputed that DZYNE did not deliver the satellite spacecraft by the end of the launch window, did not exercise its right to delay under section 5, and rejected Spaceflight's attempt to remanifest under section 12(C), DZYNE failed to comply with its contractual duties under the Amended LSA. SUF ¶¶ 45, 49, 66. Therefore, DZYNE materially breached the Amended LSA and Spaceflight is entitled to damages under Section 9(I) and Section 13 of the Amended LSA.

### iv.    Spaceflight is entitled to damages

Fourth, due to DZYNE's breach of the Amended LSA, Spaceflight asserts that it is "entitled to the unpaid amount remaining under the Amended LSA in the amount of $2,175,102, for which Spaceflight invoiced DZYNE on November 10, 2023." MSJ at 39.

It is undisputed that the price payable to Spaceflight under the Amended LSA was $10,015,000 and that DZYNE had paid Spaceflight $7,839,898 during the project. SUF ¶¶ 42, 44. As such, the remaining amount payable to Spaceflight is $2,175,102. Because the Court concludes that DZYNE materially breached the Amended LSA, the Court finds that sections 9(I) and 13 govern the damages Spaceflight is entitled to. Under section 9(I), DZYNE is liable to Spaceflight for the full price of the Amended LSA if DZYNE fails to deliver a spacecraft by the end of the launch window without exercising its right to delay under section 5. Dkt. No. 61-26 at 5. Section 13 reinforces section 9(I), stating that Spaceflight is entitled to "retain and/or be paid all payments made and owed" in the event DZYNE materially defaults in its performance of the Amended LSA. Dkt. No. 61-26 at 7. Therefore, the plain language of the Amended LSA establishes that Spaceflight is entitled to the remaining $2,175,102 unpaid by DZYNE.

### v.    Spaceflight did not waive its breach of contract claim

"To establish waiver under generally applicable contract law, the party opposing enforcement of a contractual agreement must prove by clear and convincing evidence that the waiving party knew of the contractual right and intentionally relinquished or abandoned it." *Quach v. Cal. Commerce Club, Inc.*, 323 Cal. Rptr. 3d 126, 143 (Cal. 2024). "The waiver inquiry is exclusively focused on the waiving party's words or conduct; neither the effect of that conduct on the party seeking to avoid enforcement of the contractual right nor that party's subjective evaluation of the waiving party's intent is relevant." *Id.*

DZYNE claims that "Spaceflight waived is claim that DZYNE breached the LSA" because "Spaceflight 'intentionally relinquished' its breach claim by executing the Transfer Agreement in May 2023." MSJ at 40.

Under the transfer agreement, Firefly was to "acquire all of the outstanding equity of" Spaceflight. SUF ¶ 14; *see* SUF ¶ 53 ("The Transfer Agreement did not modify the permitted

grounds for termination under the Amended LSA."). The transfer agreement also provides that Spaceflight "will remain a party to the Agreement and any and all obligations arising under the Agreement will remain an obligation of" Spaceflight. Dkt. No. 61-3 at 5.

Nothing in the transfer agreement indicates that Spaceflight relinquished its rights or obligations under the Amended LSA. *Quach*, 323 Cal. Rptr. 3d at 143; Dkt. No. 61-3 at 5. In fact, it explicitly provides that Spaceflight will remain a party to the Amended LSA. *Id.* DZYNE has not pointed to any other evidence showcasing, by clear and convincing evidence, that Spaceflight knew it would or intended to relinquish its breach claim by entering into the transfer agreement. Thus, the Court does not find that DZYNE has set forth sufficient evidence to find that Spaceflight waived its breach claim.

Accordingly, viewing the evidence most favorably as to DZYNE, the Court GRANTS summary judgment on Spaceflight's anticipatory breach and breach of contract claims.

### C. Spaceflight is Not Entitled to Summary Judgment In Its Favor On Its Breach of Implied Covenant of Good Faith and Fair Dealing as There is No Indication of Bad Faith.

Under California law, "there is an implied covenant of good faith and fair dealing in every contract." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.* 980 F.3d 1317, 1324 (9th Cir. 2020) (citing *Foley v. Interactive Data Corp.*, 254 Cal. Rptr. 2d 211, 228 (Cal. 1988)). "A party can breach the covenant without 'breach of a specific provision of the contract.'" *Id.* (citing *Carma Dev. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 6 Cal. Rptr. 2d 467, 484 (Cal. 1992)). The "question is whether the party's conduct, 'while not technically transgressing the express covenants . . . frustrates the other party's rights to the benefits of the contract.'" *Id.* (citing *Racine & Laramie, Ltd. v. Dep't of Parks & Rec.*, 14 Cal. Rptr. 2d 335, 339 (Cal. Ct. App. 1992)).

Spaceflight argues that DZYNE acted in bad faith by willfully attempting to evade its contractual obligations when it attempted to terminate the Amended LSA. MSJ at 38-39. Spaceflight points to DZYNE's conduct before and after the June 5, 2023 AFRL directive as proof. MSJ at 38; Dkt No. 61-46. Spaceflight contends that DZYNE knew AFRL had not terminated the Prime Contract for its convenience yet purported to terminate the Amended LSA under section 12(F). MSJ

at 38; *3500 Sepulveda*, 980 F.3d at 1324. DZYNE reiterates that its attempt to terminate the LSA is based on a genuine belief that the WeatherSAT cancellation entitled DZYNE to terminate the contract under section 12(F). MSJ at 39. The Court finds that Spaceflight alleges but does not provide factual evidence as to DZYNE's purported intention to evade its obligations under the Amended LSA. Therefore, there is a genuine dispute of material fact as to whether DZYNE acted in bad faith.

Accordingly, viewing the evidence most favorably as to DZYNE, the Court DENIES summary judgment on Spaceflight's implied good faith and fair dealing claim.

## CONCLUSION

For the reasons stated herein, the Court ORDERS as follows:

1.  DZYNE's Motion for Summary Judgment is DENIED:

2.  Spaceflight's Motion for Summary Judgment is GRANTED in PART:

    a.  The Court GRANTS summary judgment on its declaratory relief claim;

    b.  The Court GRANTS summary judgment on its anticipatory breach claim;

    c.  The Court GRANTS summary judgment on its breach of contract claim; and

    d.  The Court DENIES summary judgment on its implied good faith and fair dealing claim.

IT IS SO ORDERED.

Dated: November 18, 2025

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge